UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/31/2019

WIZKIDS/NECA, LLC,

                    Plaintiff,

       v.

TIII VENTURES, LLC,

                    Defendant.

17-CV-2400 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

This case concerns whether the use of the "FIZZKIDS" mark by Defendant TIII Ventures LLC ("TIII") on soda-can-themed toy figurines, infringes upon the federally registered "WIZKIDS" trademark used by Plaintiff WIZKIDS/NECA, LLC ("NECA") on fantasy-themed and other toy figurines and games. Before the Court is TIII's motion for summary judgment on all of NECA's claims, and NECA's motion to exclude the testimony of TIII's expert. For the reasons that follow, NECA's motion to exclude is denied, and TIII's motion for summary judgment is granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted and are construed in the light most favorable to Plaintiff. *See Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).[1]

TIII sells soda-can-themed toys, specifically, vinyl characters that are sold in packaging resembling a soda can. TIII Rule 56 ¶ 3 (Dkt. 49). The company is owned and operated by F.

---

[1] These facts are drawn from the parties' Rule 56.1 Statements and their submissions in connection with Defendant's motion for summary judgment. Where facts in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied only by way of a conclusory statement by the other party, without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rules 56.1(c)–(d).

Thomas Siskron III ("Siskron") and his two sons, F. Thomas Siskron IV ("Thomas") and Trenton S. Siskron ("Trent"). *Id.* ¶ 1; Trent Decl. ¶ 3 (Dkt. 47). Siskron first conceived of a soda-can-themed toy business in 1986. TIII Rule 56 ¶ 2. In 2013, the family decided to build the business, and in 2014, Trent hired a toy designer and marketing team. *Id.* After consulting with a marketing company, TIII decided to have the toy characters live in a town named Carbondale and refer to them as "FIZZKIDS." *Id.* ¶ 7. TIII subsequently launched the six toy products in the image below, which, from left to right, are called "Cranked Cola," "Bone Crusher Root Beer," "Vicious Dog Sparkling Water," "Rummy Cola," "Zombie Juice," and "Alien Limeade." *Id.* ¶¶ 5–6.



TIII advertises and sells its FIZZKIDS products on its own website, carbonationtoys.com, and through the website tenacioustoys.com, as well as at a store in Shreveport, Louisiana, called Sugarwalk Popcorn. *Id.* ¶ 13.

Plaintiff NECA "is a leading provider of collectible figures, games and game equipment in the United States and abroad." *Id.* ¶ 15 (citing Compl. ¶ 8 (Dkt. 1)). It owns the federally registered trademark "WIZKIDS" which is registered for "game equipment, namely, miniature toy figurines and role playing equipment in the nature of game book manuals; collectible toy figurines for role playing games; and role playing games and game pieces and accessories therefore." *Id.* ¶ 16 (quoting U.S. Registration No. 2,785,361). NECA uses the WIZKIDS mark to sell fantasy and science-fiction based role-playing games, related accessories, and collectible toy figurines. *Id.* ¶¶ 17, 21–22; TIII Rule 56 ¶ 17. Some of NECA's figurines that bear the WIZKIDS mark are characters that NECA licenses from well-known brands of comic books, television shows, movies, and video games, such as THE SIMPSONS, STARK TREK, MARVEL, DC COMICS, DUNGEONS & DRAGONS, PATHFINDER, and PORTAL. *Id.* ¶¶ 20, 22. Examples of these products are shown in the images below.






NECA's products are sold at brick-and-mortar stores and internet retailers, including Target, Amazon, Walmart, Toys-R-Us, Kohl's, Walgreens, Barnes & Noble, among others. *Id.* ¶ 33.

In October 2014, TIII applied to the U.S. Patent and Trademark Office (the "PTO") to register the FIZZKIDS mark for "[t]oys, namely, figures, action figures, dolls; collectible toys, namely, figures, action figures, and dolls; limited edition toys, namely, figures, action figures, and dolls; [and] cases for play accessories." *Id.* ¶ 35 (quoting U.S. App. Serial No. 86,414,168). In November 2015, NECA filed an opposition to TIII's FIZZKIDS application with the Trademark Trial and Appeal Board ("TTAB") of the PTO. *Id.* ¶ 36. The parties conducted discovery and submitted deposition testimony to the TTAB. *Id.* ¶ 37.

On April 3, 2017, NECA commenced this lawsuit, and the TTAB proceedings were stayed. NECA asserts claims for trademark infringement and false designation of origin pursuant to the Lanham Act, 15 U.S.C. §§ 1114, 1125, and New York common law, as well as a common law claim for unfair competition, and for the use of deceptive business practices and false advertising pursuant to N.Y. Gen. Bus. Law §§ 349–50. *See* Compl. ¶¶ 25–38, 43–53. NECA also seeks a

4

declaration that TIII's application to register the FIZZKIDS mark must be denied pursuant to 15 U.S.C. §§ 1119 and 1052(d). *Id.* ¶¶ 39–42.

On June 12, 2017, TIII filed a counterclaim for trademark cancellation pursuant to 15 U.S.C. § 1119, asserting that NECA's registration for the WIZKIDS mark should be cancelled based on an alleged abandonment of the mark in late 2008 or 2009. *See* Dkt. 14.

TIII has submitted an expert report authored by a Dr. Thomas Maronick. Maronick Report, Lemon Decl. Mot. to Exclude, Ex. C (Dkt. 44-3). The report analyzes the results of an "Everready" survey that Dr. Maronick commissioned on behalf of TIII, and it concludes that TIII's use of the FIZZKIDS mark "is not causing confusion with the WIZKIDS company or brand." Maronick Report at 7; TIII Rule 56 ¶ 39.[2]

Specifically, Dr. Maronick collected online survey data from a sample of 617 consumers that reported being residents of the United States, over 18 years of age, and as having purchased in the past six months, or as expecting to purchase in the next six months, a "collectible toy figurine" costing more than $10. Maronick Report at 3–4. The survey respondents were shown the following image and directed to "look at the toy and the package as you might if you were looking to buy a collectible toy figurine." *Id.*

---

[2] An "Eveready" survey, which is named after the survey endorsed by the Seventh Circuit in *Union Carbide v. Ever-Ready, Inc.*, 531 F.2d 366, 385 (7th Cir. 1976), is commonly accepted by federal courts in trademark cases as proof that a consumer is likely (or not) to confuse the source of the accused product with the owner of the asserted trademark. *See* 6 McCarthy on Trademarks and Unfair Competition, § 32:174 (5th ed.) (citing cases).



The respondents were asked: "What company makes or puts out this collectible toy figurine that you just saw?" Those that named a company were then asked: "Why do you say that?" Finally, respondents were asked: "do you believe the company that makes or puts out this product . . . IS sponsored or approved by another company, IS NOT sponsored or approved by another company, or you don't know or have no opinion." *See* Maronick Report, Ex. 1; TIII Rule 56 ¶ 42. Those that answered that they believed the product was sponsored or approved by another company were then asked: "What other company is the company that makes this collectable toy figurine sponsored or approved by?" *Id.* Based on the recorded responses, only 1 of the 617 respondents identified WIZKIDS as sponsoring or approving the FIZZKIDS product shown above. Maronick Report at 8. Dr. Maronick thus concluded that this survey demonstrates that "[v]ery few consumers . . . are likely to associate FIZZKIDS with Wizkids or Wizkids toys or perceive a relationship between FIZZKIDS and WizKids," and that TIII's use of its FIZZKIDS mark "is not causing confusion with the WizKids company or brand." *Id.*

In response to Dr. Maronick's report, NECA has submitted the rebuttal expert report of James Berger, which asserts that Dr. Maronick's survey was flawed by design and "did an inadequate job of proving no confusion exists between [the] WIZKIDS [mark] and [the] FIZZKIDS [mark]." Berger Report, Lemon Decl. Mot. to Exclude, Ex. B at 15 (Dkt. 44-2).

After TIII filed the instant motion for summary judgment, NECA filed a motion to exclude Dr. Maronick's report submitted in support of TIII's summary judgment motion.

## LEGAL STANDARDS

### I.    Summary Judgment

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted). In deciding such a motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod*, 653 F.3d at 164 (citation omitted).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation and alteration omitted).

## II.  Expert Testimony

Federal Rule of Evidence 702, which governs the admissibility of expert testimony,

provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"[Rule 702] stresses that the subject of the expert's testimony must be . . . more than subjective

belief or unsupported speculation," and must "rest[] on a reliable foundation and [be] relevant to

the task at hand." *See also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 598 (1999).

The Rule 702 inquiry is "flexible" and "depends upon the particular circumstances of the particular

case[.]" *Floyd v. City of New York*, 861 F. Supp. 2d 275, 286 (S.D.N.Y. 2012). "The proponent

of expert testimony has the burden of establishing by a preponderance of the evidence that the

admissibility requirements of Rule 702 are satisfied[.]" *United States v. Williams*, 506 F.3d 151,

160 (2d Cir. 2007).

A "trial judge should exclude expert testimony if it is speculative or conjectural or based

on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence

an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp. LLC*,

571 F.3d 206, 214 (2d Cir. 2009).  Indeed, "exclusion [of expert testimony] remains the exception

rather than the rule." *Broadspring, Inc., v. Congoo, LLC*, No. 13-CV-1866 (JMF), 2014 WL

4100615, at *15 (S.D.N.Y. Aug. 20, 2014).  Nevertheless, "when an expert opinion is based on

data, a methodology, or studies that are simply inadequate to support the conclusions reached,

*Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v.*

*Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005).  In addition, under Federal Rule of

Evidence of 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

## DISCUSSION

### I.    Lanham Act Claims

To establish a claim for trademark infringement and false designation of origin under 15 U.S.C. §§ 1114 and 1125(a), respectively, the plaintiff's mark must be "entitled to protection," and the defendant's use of the mark must be "likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 417 (2d Cir. 2018). Likewise, to establish a claim for the denial of a trademark application pursuant to 15 U.S.C. §§ 1119 and 1052(d), the plaintiff must show that the mark at issue is "likely, when used on or in connection with the goods of the applicant, to cause confusion[.]" 15 U.S.C. § 1052(d). [3] "Likelihood of confusion means a probability of confusion; it is not sufficient if confusion is merely possible." *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997). And "[a] probability of confusion may be found when a large number of purchasers likely will be confused as to the source of the goods in question." *Nora Beverages, Inc. v. Perrier Grp. Amer., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001). Here, TIII assumes the validity of NECA's WIZKIDS mark, and thus the parties' dispute turns on whether NECA can establish that TIII's use of the FIZZKIDS mark is likely to confuse consumers into thinking it originated from or is sponsored by the WIZKIDS mark.

"In determining whether there is a likelihood of consumer confusion," courts in this circuit "apply the eight-factor balancing test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d

---

[3] The "likelihood of confusion for purposes of [trademark] registration is the same standard as likelihood of confusion for purposes of infringement." *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1307 (2015).

492, 495 (2d Cir. 1961)." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016).

> The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Id.* "The application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013). While "[n]o single factor is dispositive . . . it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable . . . to explain why." *Int'l Info. Sys. Sec. Certification Consortium v. Security Univ. LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995)). The Court now reviews the factors individually, and concludes that, in their totality, no reasonable juror could find a likelihood of consumer confusion in this case.

## A. Strength of the Trademark

The parties dispute the strength of the WIZKIDS mark, NECA arguing that the WIZKIDS mark is strong, and TIII that it is not. For the reasons that follow, the Court finds that the WIZKIDS mark is at most moderately strong.

The strength of the asserted mark measures its "tendency to identify the goods . . . sold under the mark as emanating from a particular, although possibly anonymous, source." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960–61 (2d Cir. 1996). When analyzing the strength of a mark, courts consider (1) "the mark's inherent distinctiveness, based on the characteristics of the mark itself," and (2) "its acquired distinctiveness, based on associations the mark has gained

through use in commerce." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 333 (S.D.N.Y. 2013) (citing *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743–44 (2d Cir. 1998)).

"Inherent distinctiveness is traditionally measured on a scale established by the Second Circuit," which classifies a mark within one of the following categories, arranged from least to most distinctive: generic, descriptive, suggestive, and arbitrary or fanciful. *Omicron Capital, LLC v. Omicron Capital LLC*, 433 F. Supp. 2d 382, 389 (S.D.N.Y. 2006) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir. 1976)). A generic mark "is a common name, like automobile or aspirin, that describes a kind of product." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993). A descriptive mark "tells something about a product, its qualities, ingredients or characteristics." *Id.* at 1076. A suggestive mark is "not directly descriptive but suggest[s] a quality or qualities of the product, through the use of imagination, thought, and perception." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005) (citation omitted). An arbitrary mark has a dictionary meaning but one that does not describe the product, and a fanciful mark is a made-up name; both are inherently very distinctive. *Gruner + Jahr*, 991 F.2d at 1076; *Star Indus., Inc.*, 412 F.3d at 385. Classification of a mark among these four categories is a question of fact. *Lane Capital Mgt., Inc. v. Lane Capital Mgt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999).

Acquired distinctiveness refers to "the extent of recognition that the mark in fact has earned in the marketplace as a designator of its owner's goods or services[.]" *TCPIP Holding Co., Inc. v. Haar Comms., Inc.*, 244 F.3d 88, 97 (2d Cir. 2001). "This acquired distinctiveness is generally called 'secondary meaning.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). In assessing whether a mark has attained secondary meaning, courts look to the user's advertising

expenditures, commercial success, consumer studies linking the mark to its source, unsolicited media coverage, and the length and exclusivity of the mark's use. *J.T. Colby & Co. v. Apple Inc.*, No. 11 Civ. 4060(DLC), 2013 WL 1903883, at *7 (S.D.N.Y. May 8, 2013) (citing *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n.4 (2d Cir. 1997)), *aff'd*, 586 Fed. App'x 8 (2d Cir. 2014).

### 1. Inherent Distinctiveness

The parties do not contest that the WIZKIDS mark is neither generic nor descriptive. TIII argues that WIZKIDS is a suggestive mark. In its view, the "wiz" in WIZKIDS refers to either a wizard, or a smart kid, evoking the fact that WIZKIDS products consist of "fantasy and science-fiction-based role-playing games," including collectable figurines marketed to kids, which "constitutes a large part of NECA's customer base." TIII SJ Mem. at 20 (Dkt. 46). In addition to dictionary definitions of the word "wiz," the record contains various images of NECA's fantasy and science fiction-based products bearing the WIZKIDS mark. *See* NECA 30(b)(6) Dep., Exs. 5–13, Bukrinsky SJ Decl. Ex. 2 (Dkt.48); Bukrinsky SJ Decl. Exs. 4–12. The Court finds that the combination of the words "wiz" and "kids" in the name, together with the images of the products and their packaging—which include fantasy-based games, some of which bear the name "wizards of the coast," *see id.* at Exs. 4, 5—demonstrate that the mark is suggestive. *See, e.g., Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 630 (S.D.N.Y. 2012) (deeming "GIGGLE" mark used by defendant in business of providing trade information related to the children's goods industry to be suggestive because with "several steps of the imagination" one can "conjure the idea of children's goods"); *Playboy Enterprises, Inc. v. Chuckleberry Publ'g., Inc.*, 687 F.2d 563, 566 (2d Cir. 1982) (finding the "PLAYBOY" mark used in connection with PLAYBOY Magazine to be suggestive because it "signif[ies] the aspirations of PLAYBOY'S readership").

NECA argues that WIZKIDS is a fanciful mark that has "no intrinsic meaning or relationship to collectible toy figurines, and has no definition in any dictionary." NECA SJ Mem. Opp. at 8 (Dkt. 50). The Court disagrees. Although NECA's CEO and 30(b)(6) witness, Justin Ziran ("Ziran"), testified that the WIZKIDS name is not related to the products sold under the mark and is "just a name under which [NECA] operates," *see* NECA 30(b)(6) Dep. at 52:12–19; 53:13–25, Lemon SJ Decl. Ex. I (Dkt. 60), the Court is unpersuaded. Rather, the WIZKIDS mark is suggestive because with "imagination, thought and perception" one can ascertain qualities of its products. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F. 2d 70, 74 (2d Cir. 1988).

### 2. Secondary Meaning

Although a suggestive mark is inherently distinctive, which supports NECA's view that the WIZKIDS mark is strong, the Court also considers evidence of secondary meaning in determining the mark's strength. *Star Indus., Inc.*, 412 F.3d at 385. Indeed, "[e]ven an inherently distinctive mark can, in its commercial context, lack strength as a mark." *Nora Beverages, Inc.*, 269 F.3d at 123; *see also Star Indus., Inc.*, 412 F.3d at 385–86 (suggestive mark deemed weak in light of "no showing of secondary meaning").

With respect to the secondary meaning factors, the parties here focus entirely on the exclusivity of the mark's use, specifically, the extent to which the use of parts of the WIZKIDS mark by third-parties undermines the mark's overall strength. TIII points to registrations of third-party marks resembling WIZKIDS—including, among others, BIZKIDS, GRIP KIDS, THE RITZ KIDS, WHIZKID GAMES, WIZ-KIDS CHESS, WIZ-DEK and WIZKING—and argues that such third-party uses weaken the WIZKIDS mark. But TIII overlooks the fact that "[t]hird party use of the same or similar mark on different products does not necessarily undermine the strength of the mark in its own market." *WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 476

(S.D.N.Y. 2002), *aff'd sub nom. WE Media, Inc. v. Cablevision Sys. Corp.*, 94 F. App'x 29 (2d Cir. 2004). In examining the impact of third-party uses of similar marks on the strength of the WIZKIDS mark, the Court limits its inquiry to third-party uses within the market for "miniature toy figurines" and "role playing games and game pieces." TIII Rule 56 ¶ 16.

Most of the third-party marks included in the record are used in conjunction with products that bear no relation to collectable toy figurines or games. *See, e.g.*, Bukrinsky SJ Decl. Ex. 27 ("WHIZ KIDS" registered for "medical health and well-being services"), Ex. 28 ("Wiz Kid" registered for anti-microbial floor mats); Ex. 29 ("WIZ KID" registered for "[r]estaurant services featuring fast casual vegan food."). These third-party uses are not sufficiently related to the relevant market to impact the strength of the WIZKIDS mark. *See Morningside Grp. Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 139 (2d Cir. 1999) (finding district court erred by "not limit[ing] itself" to the "relevant market" of "financial investment professionals" in examining "third-party users of the 'Morningside' mark"). Two similar third-party marks appear to be more related to games played by kids and toys, generally, *see, e.g.*, Ex. 20 ("WIZ-DICE" registered for dice games), Ex. 3 (NECA's response to PTO Office Action that initially rejected the WIZKIDS mark as confusingly similar to the "WIX KIDS" mark used in connection with "toy vehicles."). On balance, however, the Court concludes that the third-party uses of marks that are similar to the WIZKIDS mark do little to undermine its strength. *Cf. Giggle, Inc.*, 856 F. Supp. 2d at 632–33 (finding the "GIGGLE" mark used in connection with business of providing information on the children's toy industry weakened by evidence of "over forty" websites and advertisements "actively using the GIGGLE mark in commerce to sell children's toys [and] market children's goods to the public").

The only other secondary meaning factors for which there is evidence in the record are NECA's commercial success and the duration of its use of the WIZKIDS mark, neither of which the parties discuss in connection with the mark's strength. The Court nonetheless notes that NECA's Ziran testified in the TTAB proceedings that NECA sells "over 10 million" WIZKIDS figures a year, with sales of "approximately[] $20 million" per year, and 80-90% of those sales occur in the United States. Ziran TTAB Dep. at 62:9–25, Bukrinsky Decl., Opp. Mot. to Exclude, Ex. 2 (Dkt. 51-2). NECA also states that the WIZKIDS mark has been in use since 2000 and was registered in 2003. NECA Resp. to TIII Rule 56 ¶ 58 (Dkt. 61). This level of commercial success and duration of the use of the WIZKIDS mark helps to support a finding of some distinctiveness in the market. *See, e.g., GoSMile, Inc. v. Dr. Jonathan Levine, D.M.D., P.C.*, 769 F. Supp. 2d 630, 638–39 (S.D.N.Y. 2011) (secondary meaning of plaintiff's trademark supported in part by gross sales of $13 million and its use for approximately 9 years); *Blumenthal Distributing, Inc. v. Executive Chair, Inc.*, 2010 WL 5980151, at *9 (E.D.N.Y. Nov. 9, 2010) (plaintiff's use of trademark for seven years, and generation of $30 million in revenue over that time based on sales of products bearing the mark weighed in favor of finding secondary meaning), *report and recommendation adopted*, No. 10-CV-1280 (CBA)(SMG), 2011 WL 839546 (S.D.N.Y. Mar. 3, 2011). NECA, nonetheless, has failed to produce any evidence with respect to advertising, media attention, consumer studies, or plagiarism, which ultimately cuts against a finding of secondary meaning. *See, e.g., Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 489 (S.D.N.Y. 2004).

In summary, the Court concludes that the WIZKIDS mark is suggestive, but because there is minimal evidence in the record to support a finding of secondary meaning, the mark is of—at most—moderate strength. *See Star Indus., Inc.*, 412 F.3d at 385 ("In the absence of any showing

of secondary meaning, suggestive marks are at best moderately strong."); *Mobileye, Inc. Picitup Corp.*, 928 F. Supp. 2d 759, 779 (S.D.N.Y. 2013) (finding that suggestive mark that appeared "to have enjoyed some commercial success and have garnered unsolicited press and attention" but for which the plaintiff had "point[ed] to no relevant consumer surveys or plagiarism attempts" was a "moderately strong mark" for purposes of summary judgment). Accordingly, the first factor weighs in NECA's favor, but only moderately so.

### B. Similarity of the Marks

"Similarity is a holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances." *Bath & Body Works Brand Mgt., Inc. v. Summit Entm't, LLC*, 7 F. Supp. 3d 385, 394 (S.D.N.Y. 2014) (citing *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005)). To ascertain whether similarity between marks "could cause confusion among prospective purchasers," the Court "look[s] to the overall impression created by the logos and the context in which they are found." *Star Indus.*, 412 F.3d at 386; *Nabisco, Inc., v. Warner-Lambert Co.*, 220 F.3d 43, 47 (2d Cir. 2000).

The parties' marks sound similar because they are phonetically alike and are both comprised of a word ending in "IZ" followed by the word "kids." Although "at first blush, the use of the same word appears to weigh . . . in favor of similarity, the use of the same words is far from dispositive." *Medici Classics Prods., LLC*, 683 F. Supp. 2d 304, 311 (S.D.N.Y. 2010). Where, as here, the marks convey notably different commercial impressions, for the reasons explained below, the similarity in sound does not overcome a finding that the marks are dissimilar. *See Nabisco, Inc.*, 220 F.3d at 47 (concluding that DENTYNE ICE and ICE BREAKERS were dissimilar as a matter of law because the "cumulative effect of the differences between the parties' products and in the commercial presentation of their marks create[d] distinct marketplace impressions"); *Medici*

*Classics Prods., LLC*, 683 F. Supp. 2d at 311 (finding "Medici Classics" to be dissimilar to "Medici Masters" and "Medici Arts" when considering the "overall impression created by the marks" based on differences in "typefaces and presentation").

The parties' marks do not look similar. They have distinctly different fonts and color combinations. The letters in the FIZZKIDS mark are straight and narrow. The letters in the WIZKIDS mark are wider and slanted, and are presented in a more decorative font that mimics hand lettering found on painted signs or graffiti. *Compare* Trent Decl. ¶ 7 & Ex. 2, *with* Bukrinsky SJ Decl., Ex. 10 at FIZZ003171. There are multiple dots above the first 'I' in FIZZKIDS, presumably to invoke the 'fizzy' nature of the soda. The 'I's in the WIZKIDS mark, by contrast, are in lower case, possibly invoking exclamation marks, the first of which is upside down. *See id.* The color of the WIZKIDS letters are white, with individual black outlines and yellow drop shadows. The color of the FIZZKIDS letters change to match the color of the particular soda can on which they are displayed, and they are set out on a background that outlines the entire word, rather than the individual letters. *See id.* The FIZZKIDS mark is also located on the front of its packaging, whereas the WIZKIDS mark is located at the top, back, side, or bottom, depending on the product. TIII Rule 56 ¶¶ 25–28. These differences in the style and presentation undercut the similarity of the sound of the marks. *See, e.g., Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 581–82 (2d Cir. 1991) (differences in typeface and location of "NEW CHOICES" and "NEW CHOICES PRESS" contributed to finding no issue of fact with respect to similarity of marks).

The overall impressions created by the parties' marks are also distinct because the marks convey different meanings and are presented in different contexts. The word "fizz" in FIZZKIDS is defined to mean "a hissing or sputtering sound," or "an effervescent beverage." *See Merriam-Webster*, "fizz," http://www.merriam-webster.com/dictionary/fizz; Oxford English Dictionary

Online, "fizz, n." http://www.oed.com/view/Entry/70844). In the context of the FIZZKIDS products, the "fizz" is an obvious reference to their soda-can-themed packaging, which includes character names that further reflect the soda-can-theme (e.g., "Rummy Cola") in addition to the company's name, "Carbonation Toys," which reflects the town in which the soda characters live. *See* TIII Rule 56 ¶¶ 7–9, 11; Thomas Dep. at 9:17–21, Lemon SJ Decl. Ex. E. The word "wiz," however, has been defined as synonymous with "genius" or "wizard" and, as NECA acknowledges, the WIZKIDS mark is not presented in connection with any soda related theme. *See Merriam-Webster*, "wiz," https://www.merriam-webster.com/dictionary/wiz; TIII Rule 56 ¶ 32. The use of the soda theme in TIII's products thus supports their dissimilarity to the WIZKIDS products. *See, e.g., Stephan Co. v. Elizabeth Arden, Inc.*, No. 06 Civ. 3871 (LTS)(FM), 2006 WL 8430160, at *10 (S.D.N.Y. Dec. 6, 2006) (fact that Defendant's mark was used on products with "common theme" whereas Plaintiff's was not supported conclusion that they were dissimilar).

TIII argues that the WIZKIDS mark is further distinguishable because, unlike the FIZZKIDS mark, the "WIZKIDS mark is used primarily with products that bear more famous licensed brands." TIII SJ Mem. at 16. This is strongly supported by the evidence. The images of NECA's products in the record include the WIZKIDS mark in conjunction with other well-known brands, such STAR TREK, DUNGEONS & DRAGONS, PATHFINDER, BATMAN, THE SMURFS, AND MARVEL. *See* Bukrinsky SJ Decl. Exs. 4–12. The "Second Circuit has repeatedly found . . . the presence of a distinct brand name . . . weigh[s] against a finding of confusing similarity." *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 522 (S.D.N.Y. 2008); *see also LaPine v. Seinfeld*, No. 08 Civ. 128(LTS)(RLE), 2009 WL 2902584, at *14 (S.D.N.Y. Sept. 10, 2009) (defendants' use of the "Seinfeld" name on cookbook along with

allegedly infringing mark weighed in favor of dissimilarity between the parties' marks), *aff'd*, 375

Fed. App'x 81 (2d Cir. 2010); *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 164–

65 (2d Cir. 2004) (presence of brand name "Quilted Northern" on defendants' product "Moist-

Ones" towelettes decreased similarity with plaintiff's "Wet Ones" towelettes), *superseded by*

*statute on other grounds as recognized in Starbucks Corp.*, 588 F.3d at 107–08.

NECA's arguments that the marks are presented in similar contexts are unavailing. NECA

suggests that the FIZZKIDS packaging is not sufficiently distinct from its own because "some

WIZKIDS products are also sold in a cylindrical shaped package." TIII Mem. Opp. at 11. It is

not merely the cylindrical shape that distinguishes the FIZZKIDS products, however, but rather

their soda-can-themed packaging and the unique soda-themed characters. NECA also seeks to

dampen the significance of the fact that many of its products include the WIZKIDS mark alongside

more famous brand names by asserting that it has "recently introduced two new lines of products

that bear only its own marks, and plans on expanding its offerings of products that do not bear

licensed marks." NECA SJ Mem. Opp. at 12; *see also* NECA 30(b)(6) Dep. at 94:12–14, Lemon

SJ Decl. Ex. I (testifying that products that bear only WIZKIDS' marks sell "very well"). These

unsubstantiated statements, however, do not support a finding that even products bearing only the

WIZKIDS mark present a similar commercial impression to the soda-themed products bearing the

FIZZKIDS mark.

In short, the similarity in the sound of the parties' marks is eclipsed by the differences in

their meaning, modes of presentation, and the overall impression they convey. *See, e.g., Lopez v.*

*Gap, Inc.*, 883 F. Supp. 2d 400, 420–21 (S.D.N.Y. 2012) (parties' use of the letters "L," "E," and

"S" in a similar pattern were ultimately not similar as a matter of law due to "differ[ences] both

visually and in the overall impression they convey"); *Rush Indus., Inc. v. Garnier, LLC*, 496 F.

Supp. 2d 220, 226 (E.D.N.Y. 2007) (deeming marks "Long & Strong" and "Long 'n Strong" dissimilar as a matter of law due to differences in typeface, packaging, and overall impression created by the words), *aff'd*, 309 Fed. App'x 431 (2d Cir. 2009). This factor, therefore, strongly favors TIII.

### C. Competitive Proximity

The competitive proximity factor "concerns whether and to what extent the two products compete with each other." *Morningside*, 182 F.3d at 140. If the products "serve the same purpose, fall within the same general class or are used together, the use of similar designations is more likely to cause confusion." *Lang*, 949 F.2d at 582. In analyzing competitive proximity, courts consider "whether the products differ in content, geographic distribution, market position, and audience appeal." *Savin Corp.*, 391 F.3d at 458.

TIII argues that, to the extent consumers purchase toy figurines from NECA as collectible items, NECA's consumers are attracted by the marks of the famous licensed brands on the WIZKIDS products, including MARVEL, STAR TREK, or BATMAN, rather than the WIZKIDS mark. Accordingly, TIII asserts that the FIZZKIDS products would not appeal to NECA's "collector customers." By contrast, NECA's position is that both parties' products are in the market for collectable toy figurines, generally, and that consumers of WIZKIDS products would also be interested in purchasing TIII's products, despite the fact that TIII's products do not include the marks of other well-known brands.

Given that the images of NECA's products in the record include other well-known brand names and characters, while the FIZZKIDS products do not, a reasonable juror might conclude that consumers who purchase NECA's figurines would not be interested in the FIZZKIDS

20

products; such a conclusion would be consistent with the differences in the appearance of the parties' products and the lack of similarity between the marks, as previously discussed.

On the other hand, a reasonable juror might conclude that both parties' products would appeal to consumers interested in toy figurines, generally—without regard to whether the figurines are associated with famous characters and brands. A child that plays with Batman or Star Trek figurines may also find the quirkier soda-themed products desirable. The overlap in the products' price points further supports this argument. Although some of NECA's products can cost up to $400, many of them cost as little as $2.99, while the FIZZKIDS products cost $15. NECA Resp. TIII Rule 56 ¶ 95; *see U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 530 (S.D.N.Y. 2011) (difference in price points between plaintiff's products, which sold for approximately $25, and defendant's products, which sold for between $50 and $70 was "not so vast as to place a large competitive distance between the [parties'] products").

TIII has therefore not established that there is no issue of fact in dispute as to whether the products appeal to the same consumers. As TIII's Siskron testified, TIII views "[a]nybody who is trying to get the toy dollars [a]s competition." Siskron Dep. at 55:20–23, Lemon SJ Decl. Ex. K. In addition, evidence in the record establishes that Zarin testified that NECA is developing new products that bear marks owned only by WIZKIDS, and consist of collectable toy figurines that are not of famous characters but include more generic "horror figurines . . . loosely based on zombies, [and] draculas." NECA 30(b)(6) Dep. at 106:5–11. This evidence further demonstrates that there are questions of fact with respect to whether the content and audience appeal of the products establish competitive proximity.

With respect to geographic distribution, NECA claims that the products are sold in the same trade channels because they have both been previously sold at Comic-con conventions and

on the Internet. *See* NECA Resp. Rule 56 ¶¶ 89–90. But NECA's products are sold at numerous brick-and-mortar stores and websites including Target, Amazon, Walmart, Toys-R-Us, Kohl's, Walgreens, Barnes & Noble, among others, while TIII's products are only sold on two websites— carbonationtoys.com and TenaciousToys.com—and at a single shop called Sugarwalk Popcorn in Louisiana. TIII Rule 56 ¶¶ 32, 33. In addition, TIII claims that it has no intention of selling its products at Comic-con conventions in the future, (TIII 30(b)(6) Dep. at 110:3–14, Lemon SJ Decl. Ex. A), and in any event, mere overlap of sales at trade shows does little to establish proximity. *See Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12 Civ. 4112(AJP), 2014 WL 814532, at *16 (S.D.N.Y. Mar. 3, 2014). Although NECA stated that it could not know for certain whether some of its retailers also sold its products on TenaciousToys.com, TIII Rule 56 ¶ 34, the evidence on geographic distribution favors TIII.

Considering competitive proximity, as a whole, however, the issues of fact concerning the audience appeal and market position of the parties' products supports the conclusion that reasonable jurors could disagree on whether this factor favors TIII or NECA.

### D. Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., Inc.*, 412 F.3d at 387. This factor is meant to "protect[] the plaintiff's interest in being able to enter a related field at some future time," *Cartier*, 294 Fed. App'x at 619, but it is "irrelevant . . . where the two products are in direct competition with each other," *Starbucks Corp. v. Wolfe's Borough Coffee Inc.*, 588 F.3d 97, 115 (2d Cir. 2009). Thus, to the extent a jury concluded that the products already compete, this factor is neutral. *See id.* (deeming factor neutral where competing marks used in connection with sale of coffee products).

To the extent a jury concluded that the products are not presently in competitive proximity, the evidence supports a conclusion that NECA intends to "bridge the gap" into collectable figurines that are not associated with famous brands licensed by NECA. NECA's Zarin asserts that "[p]roducts that are marked only with WizKids' owned marks . . . [ar]e a growing segment of our product offerings," and that NECA "recently released a zombie-themed line of products . . . [and] a line of products called Wardlings that also only bear WizKids' owned marks." Zarin Decl. ¶ 8, Lemon SJ Decl. Ex. E. Although it is true that NECA does not intend to market soda-can-themed toys specifically, (TIII Rule 56 ¶ 32), TIII provides no authority to support such a narrow reading of the market for FIZZKIDS' products. NECA has thus raised issues of fact as to whether it is expanding its product lines of collectible figurines in a fashion that would "bridge the gap," and whether "prospective customers are aware of this intention." *Strange Music*, 326 F. Supp. 2d at 493; *see also Medici Classics Prods., LLC*, 683 F. Supp. 2d at 312 (finding that fact that plaintiff "stated an intent to expand its business" to selling recordings of classical music that were not his own was sufficient to infer an intent to bridge the gap into the market for classical recordings); *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, No. 12 Civ. 7992(KBF), 2014 WL 185222, at *13 n.2 (S.D.N.Y. Jan. 6, 2014), *aff'd*, 826 F.3d 27 (2d Cir. 2016).

Accordingly, depending on how one resolves the questions of fact underlying the competitive proximity inquiry, the "bridging the gap" factor is either irrelevant or weighs in favor of NECA.

### E. Actual Confusion

"[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Guthrie Healthcare Sys.*, 826 F.3d at 45 (2d Cir. 2016). Evidence of

actual confusion can nonetheless be presented through "consumer-survey evidence" or "anecdotal evidence of confused consumers in the marketplace." *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 532. Where a defendant submits survey evidence "tending to rebut charges of actual consumer confusion," plaintiff's "failure to present its own consumer survey weighs against a finding of consumer confusion." *Star Indus. Inc.*, 412 F.3d at 388.

NECA admits that it has no evidence of actual confusion among consumers but asserts that its inability to produce evidence of actual confusion is justified based on TIII's Thomas testimony that only a few hundred of FIZZKIDS' products have been sold. Thomas Dep. at 21:20–24. *See GoSMile, Inc.*, 769 F. Supp. 2d at 642 (noting that "a plaintiff is not to be judged harshly for failing to show actual confusion when a new product is barely on the market"). TIII, on the other hand, has submitted the expert report of Dr. Maronick that found an absence of actual confusion in a consumer survey. NECA moves to exclude Dr. Maronick's opinion and report, as well as his testimony in which he opined that there is no likelihood of confusion between the WIZKIDS and FIZZKIDS marks, due to multiple flaws in his Ever-ready survey. As the Court will explain, although NECA's arguments are not without merit, they ultimately go to the weight—not the admissibility—of the survey. The Court gives the survey little weight and holds that, even if it were to exclude the survey, doing so would not alter its conclusion that there is no likelihood of consumer confusion in this case.[4]

---

[4] The Court notes that, although NECA did not contest Dr. Maronick's qualifications in conducting and analyzing consumer surveys in its memorandum of law, it nonetheless disagreed with TIII's statement that Dr. Maronick is a "well[-]known survey expert." NECA Resp. to TIII Rule 56 ¶ 39 (Dkt. 61). Dr. Maronick is an Emeritus Professor of Marketing in the College of Business and Economics at Towson University. Maronick Report at 2. He has a Doctorate and Master's in Business Administration from the University of Denver and the University of Kentucky, respectively, as well as a J.D. from the University of Baltimore School of Law. *Id.* From 1980-1997, he served as the in-house marketing expert for all divisions of the Federal Trade Commission ("FTC"), and he has testified as an expert witness in trademark and marketing-related consumer cases in various federal courts. *Id.* The Court finds that Dr. Maronick is qualified to be an expert in consumer survey analysis in connection with trademark infringement litigation. *See Invisible Fence, Inc. v. Fido's Fence, Inc.*, No. 3:09-CV-25, 2013 WL 6191634, at *3 (E.D. Tenn. Nov. 26, 2013) (deeming Dr. Maronick qualified under Rule 702 to offer testimony based on survey

### 1. The Maronick Survey

NECA asserts that Dr. Maronick's use of an Ever-ready survey was inappropriate because he could not establish that the WIZKIDS mark is a "top-of-mind" mark—i.e., a mark that is "readily accessible in memory." NECA Mem. Mot. to Exclude at 9 (Dkt. 43) (citing Jerre B. Swann, *Eveready and Squirt—Cognitively Updated*, 106 Trademark Rep. 727, 734 (2016), Lemon Decl. Mot. to Exclude Ex. A) (Dkt. 44-1). But NECA cites no case, and the Court has found none, in which an Ever-ready survey was excluded on the grounds that the mark being tested was not so strong as to be considered a "top-of-mind" mark. Moreover, courts in this district have held that such doubts ultimately go to the weight of the evidence rather than its admissibility. *See Akiro LLC*, 946 F. Supp. 2d at 338–39 (objections that Ever-ready survey was not appropriate because the senior mark MISS JESSIE'S was "not iconically strong" were among objections that "at most diminish the weight of the survey evidence"); *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 291 (S.D.N.Y. 1997) (assigning "reduced evidentiary significance," but not excluding, results of a variant of an Ever-ready survey where the survey "may not have been the most appropriate format . . . [b]ecause the marks at issue . . . are the titles of books rather than the names of common household products").

NECA further argues that the survey should be excluded because it lacked a control and because it failed to accurately replicate marketplace conditions. Critiques of surveys based on the lack of, or an inadequate use of, a control, however, also typically go the survey's weight and not its admissibility. *See, e.g.*, *In re Scotts EZ Seed Litig.*, No. 12 CV 4727 (VB), 2017 WL 3396433, at *8 (S.D.N.Y. Aug. 8, 2017). And Dr. Maronick presented images of the FIZZKIDS products online in a manner similar to how those products are presented when they are sold online.

---

data in a trademark case).

*Compare* Maronick Report, Ex. 2 at Question 9, *with* Bukrinsky Decl. Opp. Mot. to Exclude, Ex. 4 (Dkt. 51). Although TIII also sells its products at a store in Louisiana, while the survey replicated only internet purchases of the FIZZKIDS' products, this critique does not render Dr. Maronick's survey inadmissible. *See GoSMile, Inc.*, 769 F. Supp. 2d at 642 (considering Ever-ready survey conducted online where parties' products were also sold in brick-and-mortar stores).

Finally, NECA argues that the universe of consumers surveyed by Dr. Maronick was flawed, because the question that asked whether survey respondents had purchased or intended to purchase collectible figurines costing at least $10 did not include an upper price limit, and thus could have captured consumers that purchase much more expensive figurines. NECA also contends that the survey should have included consumers under 18 years of age and that it should have defined the term "collectible toy figurine." Although these arguments are not without merit, they again simply diminish the weight of the survey evidence rather than provide grounds for its exclusion. *See, e.g., Rise-N-Shine, LLC v. Duner-Fenter*, No. 14-CV-1305 (RJS), 2015 WL 876470, at *3 (S.D.N.Y. Feb. 28, 2015) (finding arguments that universe of respondents was defined incorrectly in consumer survey "d[id] not rise to the level of destroying all relevance"); *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 451–52 (S.D.N.Y. 2017) (failure to exclude "higher-end" consumers affected weight to be given survey results but did not "strip them of probative value").[5]

---

[5] NECA also asserts that the survey was unreliable because, when the respondents were asked to identify which company they thought the FIZZKIDS figure was associated with, they were unable to simultaneously look at the image of the figure, as it was shown only in the previous question. Indeed, Dr. Maronick's testimony on this issue supports the view that permitting respondents to continue looking at the FIZZKIDS figure when answering the question about its source would have been more appropriate. *See* Maronick Dep. at 52:23–25; 51:10–11; 53:8–12. This argument is undercut by the fact that NECA's rebuttal expert did not make any such criticism in his report. In any event, like with the other criticisms of the survey, "errors in methodology . . . properly go only to the weight of the evidence—subject, of course, to Rule 403's more general prohibition against evidence that is less probative than prejudicial." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999).

The Court thus places limited weight on the survey in light of the flaws in its methodology. But, as noted above, even if the Court were to exclude the survey under Rule 403, NECA's failure to produce any evidence demonstrating actual confusion—even though sales of the FIZZKIDS products have been limited—still supports the position that this factor weighs in TIII's favor.

### F. Bad Faith

The bad faith inquiry concerns "whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." *Savin Corp.*, 391 F.3d at 460 (alterations omitted).

Here, there is no evidence that TIII selected the FIZZKIDS mark in bad faith. TIII asserts that it chose the FIZZKIDS mark because it is suggestive of the "fizzy" nature of soda, which is bolstered by the fact that TIII sells its FIZZKIDS products under the corporate name "Carbonation Toys," and that the unique soda-can-themed characters "live" in "Carbondale." Choosing a mark because it "reflects the product's characteristics" supports a finding of good faith. *Lang*, 949 F.2d at 583. So too does the fact that TIII's Trent asserted that TIII chose the FIZZKIDS mark before it was aware of the WIZKIDS mark, and that TIII previously engaged in trademark searches and sought the advice of counsel. Trent Decl. ¶ 12; *see J.T. Colby, Inc., v. Apple Inc.*, 2013 WL 1903883, at *23–24. As NECA has produced no evidence to contest TIII's good faith, this factor clearly weighs in TIII's favor.

### G. Respective Quality

The Second Circuit has explained that "[a] marked difference in quality . . . actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user." *Savin Corp.*, 391 F.3d at 461; *see also U.S. Polo Ass'n, Inc.*, 800 F.

Supp. 2d at 537 (citing cases noting that similarity in quality of products may lead to a greater likelihood of confusion "inasmuch as consumers may expect products of similar quality to emanate from the source"). Some courts in this district have highlighted that this factor "goes more to the harm that confusion can cause than it does to the likelihood of confusion," and have deemed it "one of the less probative factors" in assessing likelihood of confusion. *Lopez*, 883 F. Supp. 2d at 423 (quoting *DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate*, 440 F. Supp. 2d 249, 278–79 (S.D.N.Y. 2006)).

NECA's arguments regarding this factor weigh against it. NECA argues that the FIZZKIDS products are of an inferior quality because TIII's Siskron testified that the company had experienced issues with respect to the paint of the figures coming off the packaging, and that it was working on making the mold lines on the products less visible. Siskron Dep. at 87:20–88:7; *see also* Lemon SJ Decl. Ex. O at 19. But as noted, such quality issues can weigh against a likelihood of consumer confusion. The Court thus concludes that this factor slightly favors TIII but that it also deserves little weight when balancing the factors.

### H. Sophistication of Consumers

This final factor "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (alterations in original). Generally, "the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." *Savin*, 391 F.3d at 461. "The expense of the products, the manner and market conditions in which the products are purchased, and whether purchasers may be subject to impulse are relevant in determining the sophistication of the buyers." *Bath & Body Works Brand Mgt., Inc.*, 7 F. Supp. 3d at 398 (citing cases).

The statements made by NECA's predecessor-in-interest, when responding to the PTO's initial rejection of its application to register the WIZKIDS mark, support TIII's position that NECA's consumers are sophisticated. Specifically, to differentiate its mark from the registered third-party mark "WIX-KIDS" for toy vehicles, NECA's predecessor-in-interest stated that the "consumers of the goods offered under the [WIZKIDS] mark populate a community of gaming enthusiasts . . . that are thus likely to be knowledgeable about the goods they have chosen." Bukrinsky SJ Decl. Ex. 3 at 5–6. NECA responds, however, that in the sixteen years since its predecessor made that statement, NECA has "greatly expanded its product line and customers" to include children and impulse buyers. NECA SJ Mem. Opp. at 17; *see also* Ziran Decl. ¶ 8, Lemon SJ Decl. Ex. G; NECA 30(b)(6) Dep. 106:2-23, Lemon SJ Decl. Ex. I. In addition, NECA correctly notes that the inexpensive nature of many of its products (some cost as little as $2.99, NECA Resp. Rule 56 ¶ 96) supports a conclusion that its customers are less sophisticated. *See CJ Products LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011) ("Generally, the more inexpensive the product, the less careful the retail consumer is presumed to be."). NECA has therefore raised factual issues with respect to the level of sophistication of its consumers, because it has submitted evidence suggesting that segments of its consumers are not as sophisticated as TIII maintains. Reasonable jurors could disagree on whether this factor favors TIII or NECA.

## I. Balancing the Factors

"In balancing the *Polaroid* factors, courts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins. Instead, the court should focus on the ultimate question of whether consumers are likely to be confused." *Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005).

The dissimilarity of the parties' marks and the lack of evidence of bad faith weigh strongly in TIII's favor. The lack of evidence of actual confusion and the evidence concerning the differences in the quality of the products also weigh in TIII's favor, albeit to a lesser degree. The strength of the mark weighs in NECA's favor, but only moderately so, and there are disputed issues of fact with respect to the competitive proximity of the products, NECA's efforts to bridge the gap, and the level of consumer sophistication. Although a jury could find that the marks have some competitive proximity, the evidence in support of that view is not substantial. Similarly, even if a jury found that consumers of NECA's products are not quite as sophisticated as TIII maintains, it is of little moment. Accordingly, even though there are some disputed issues of fact in this case, when considered cumulatively, they are not material because no reasonable juror could find a likelihood that consumers will be confused as to the origin or sponsorship of the FIZZKIDS products. Put another way, even if a jury concluded that all the factors for which there remain underlying issues of fact weigh in NECA's favor, the maximum weight that can reasonably be assigned to these factors cannot overcome the finding that "looking at the products in their totality," consumers are not likely to be confused. *Starbucks Corp.*, 588 F.3d at 115. TIII's motion for summary judgment on NECA's Lanham Act claims is granted.

## II.    State Law Claims

As previously noted, NECA also asserts claims for common law trademark infringement, unfair competition, and deceptive acts and practices under N.Y. Gen. Bus. Law Sections 349 and 350. The Court grants TIII's motion for summary judgment on these claims as well.

To prevail on its common law claim of trademark infringement, NECA must again show a "likelihood of confusion as to the source or sponsorship of defendant's products," *Standard & Poor's Corp., Inc., v. Commodity Exch., Inc.,* 683 F.2d 704, 708 (2d Cir. 1982), which is assessed

under the same confusion standard as for infringement under the Lanham Act, *Katz v. Modiri*, 283 F. Supp. 2d 883, 900 (S.D.N.Y. 2003). As NECA is unable to do so, its common law trademark infringement claim fails. *Lopez*, 883 F. Supp. 2d at 430.

Claims under New York's unfair competition law are analyzed in a similar fashion to claims under the Lanham Act. *See Louis Vuitton Malletier*, 454 F.3d at 119. "In addition to likelihood of confusion, however, '[a] plaintiff claiming unfair competition under New York law must show that the defendant acted in bad faith.'" *Drone Racing League, Inc. v. DR1, LLC*, No. 18-cv-4093 (DLC), 2018 WL 6173714, at *5 (S.D.N.Y. Nov. 26, 2018) (quoting *Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 485 (2d Cir. 2005)). As there is no genuine dispute of fact that TIII has not engaged in any bad faith, let alone that there is a likelihood of a consumer confusion with respect to the marks at issue, NECA's unfair competition also fails. *See Brockmeyer*, 248 F. Supp. 2d at 299.

As to NECA's causes of action under Sections 349 and 350 of the New York General Business Law, "[it] is well settled . . that trademark . . . infringement claims are not cognizable under these statutes unless there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution." *Nat'l Distillers*, 198 F. Supp. 2d at 486–87. Nothing in the record could support a finding that TIII has injured the public interest, and this claim, therefore, fails as well.

Accordingly, TIII is entitled to summary judgment on NECA's state law claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion to exclude is DENIED and NECA's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the

motions pending at Dkts. 42 and 45. Because neither party has moved for summary judgment on TIII's counterclaim seeking a declaratory judgment that the WIZKIDS mark be cancelled pursuant to 15 U.S.C. § 1119, the Court cannot enter a final judgment. TIII must inform the Court no later than April 8, 2019, as to whether it intends to further pursue this counterclaim.

SO ORDERED.

Dated:      March 31, 2019
            New York, New York

Ronnie Abrams
United States District Judge